AO 106 (Rev. 04/10) Application for a Search Warrant

FILED
U.S. District Court
District of Kansas
09/21/2026
Clerk, U.S. District Court
By: MV Deputy Clerk

# UNITED STATES DISTRICT COURT

for the
District of Kansas

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
An iPhone 17 cellular telephone obtained from Cameron Blount at the time of his arrest and currently located within the Homeland Security Investigations office in Wichita, Kansas

Case No. 26-M-6231-01-BGS

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
An iPhone 17 cellular telephone obtained from Cameron Blount at the time of his arrest and currently located within the Homeland Security Investigations office in Wichita, Kansas

located in the ______ District of Kansas, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 2423(a),. 2423(b), 2422, 2251(a), 2252A(a)(2), 2252A(a)(3)(B), 2252A(a)(1), 2252A(a)(5)(B) | transportation with intent to engage in criminal sexual activity; travel with intent to engage in illicit sexual conduct; coercion and enticement; production of child pornography; distribution/receipt of child pornography; distributes or solicits child pornography, transportation of child pornography; possession of child pornography |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: __________ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]
*Applicant's signature*

Travis Putrah, SA, Homeland Security Investigations
*Printed name and title*

Sworn to before me and signed via Zoom.

Date: 9/21/2026

[signature]
*Judge's signature*

City and state: Wichita, Kansas

Honorable Brooks G. Severson, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Travis Putrah, being duly sworn, hereby deposes and states the following:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with Homeland Security Investigations ("HSI") and have been so employed since September 2019. I am currently assigned to the HSI Resident Agent in Charge ("RAC") office in Wichita, Kansas.

a. I have been responsible for investigating technology-facilitated child sexual exploitation crimes since 2021. In this role, I routinely work with the Kansas Internet Crimes Against Children ("ICAC") Task Force and investigate violations of federal criminal laws; to include offenses pertaining to the illegal production, distribution, receipt, and possession of child pornography (in violation of 18 U.S.C. § 2251, 2252, and 2252A).

b. I have conducted over fifty federal child exploitation investigations involving violations of possession, distribution, receipt, and production of child pornography, the transportation of child pornography, the coercion/enticement of minors, and the transportation of minors for the purpose of criminal sexual activity. I have also assisted state and local partners with state investigations involving the sexual exploitation and sexual assault of minors.

c. As such, I have become familiar with ways that child pornography is distributed, traded, and produced; including the use of electronic devices, various social media websites, messaging applications (e.g. Google, Kik, Instagram, Facebook, Snapchat, Discord, Telegram, Wire, Vector, Element, WhatsApp, etc.), peer-to-peer ("P2P") software (e.g. BitTorrent, µTorrent, qBittorrent) and cloud-based storage services (e.g. Dropbox, iCloud, MegaNZ, Synchronoss, etc.) to facilitate those crimes.

d. As part of these investigations, I have drafted and executed search warrants on residential properties, vehicles, electronic devices, and electronic service providers. I have received training on handling electronic evidence, executing manual searches of electronic devices, and conducting forensic examinations utilizing forensic tools/software. I have extensive experience in leading interviews of persons who possess, distribute, and produce child pornography.

e. Prior to my tenure as a Special Agent with HSI, I was employed as a Border Patrol Agent within the Department of Homeland Security ("DHS") from 2005 to 2019. From 2015 to 2018, I was assigned to the Federal Bureau of Investigations' ("FBI") Indian Country Task Force in Bemidji, Minnesota. My duties included investigating crimes of violence; to include homicides and assaults with deadly

weapons; sexual assaults of juveniles; human trafficking; trafficking of child pornography; illegal trafficking of firearms and explosives; arson; the manufacture, sale, and distribution of controlled substances; and the disruption/dismantling of violent gangs.

f. From 2018 to September 2019, I was assigned to the HSI Wichita, Kansas office as a Task Force Officer ("TFO"). While serving as an HSI TFO, I was responsible for investigating federal violations of the trafficking of controlled substances; the production and sale of fraudulent documents; violations of immigration law; the theft of intellectual property; and the trafficking of child pornography.

g. As a requirement for employment as an HSI Special Agent, I successfully completed a twelve-week Criminal Investigator Training Program ("CITP") located at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia. At the conclusion of CITP, I also completed an additional twelve-week HSI Special Agent Training ("HSISAT") Academy. As part of the training at FLETC, I received extensive instruction in the areas of Customs law, Immigration law and Criminal law.

## PURPOSE OF THE AFFIDAVIT

1. This Affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure in support of a search warrant for an **iPhone 17 cellular telephone (hereinafter referred to as "TARGET DEVICE")** obtained from **Cameron Blount** at the time of his arrest and currently located within the Homeland Security Investigations office in Wichita, Kansas.

2. The statements in this Affidavit are based on police reports, statements and information provided by other law enforcement officers involved in this investigation, and from my own observations made during the investigation. Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband and evidence, fruits, and instrumentalities of the federal violations listed below are located within the electronic device described in Attachment A.

## STATUTORY AUTHORITY

3. This investigation concerns alleged violations relating to material involving the sexual exploitation of minors. More specifically violations of 18 U.S. Code § 2423(a) (transportation with intent to engage in criminal sexual activity); 18 U.S. Code § 2423(b) (travel with intent to engage in illicit sexual conduct); 18 U.S. Code § 2422 (coercion and enticement); 18 U.S.C. 2251(a) and (production of child pornography); 18 U.S.C. § 2252A(a)(2) (distribution/receipt of child pornography); 18 U.S.C. § 2252A(a)(3)(B) (distributes or solicits child pornography); 18 U.S.C. § 2252A(a)(1) (transportation of child pornography); and 2252A(a)(5)(B) (possession of child pornography):

a. 18 U.S. Code § 2423(a) prohibits knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce, with intent that the individual engages in prostitution, or in any sexual activity for which any person can be charged with a criminal offense;

b. 18 U.S. Code § 2423(b) prohibits a person who travels in interstate commerce or into the United States, with intent to engage in any illicit sexual conduct with another person;

c. 18 U.S.C. § 2422(b) prohibits a person from using the mail or any facility or means of interstate or foreign commerce to knowingly persuade, induce, entice, or coerce any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempting to do so;

d. 18 U.S.C. 2251(a) prohibits any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who transports any minor in or affecting interstate commerce, with the intent that such minor engage in, any sexual explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct;

e. 18 U.S.C. § 2252A(a)(2) prohibits knowingly receiving or distributing any child pornography that has been mailed or shipped or transported in interstate or foreign commerce by any means, including by computer;

f. 18 U.S.C. § 2252A(a)(3)(B) prohibits promoting, presenting, distributing, or soliciting any material or purported material in a manner that reflects the belief, or that is intended to cause another to believe that the material or purported material is or contains obscene visual depictions of a minor engaging in sexually explicit

conduct or visual depictions of an actual minor engaging in sexually explicit conduct;

g. 18 U.S.C. § 2252A(a)(1) prohibits knowingly transporting child pornography using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mail;

h. 18 U.S.C. § 2252A(a)(5)(B) prohibits knowingly possessing, or accessing with intent to view, any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer;

## DEFINITIONS

4. The following definitions apply to this Affidavit and Attachment B:

a. "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

b. "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

c. "Cloud storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet.

d. "Chat room," as used herein, refers to the ability of individuals to meet in one location on the Internet in order to communicate electronically in real-time to other individuals. Individuals may also have the ability to transmit electronic files to other individuals within the chat room.

e. "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility

directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

f. "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units; internal and peripheral storage devices such as fixed disks; external hard drives; "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer; and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

g. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

h. "Digital camera" is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

i. A "GPS" navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna

receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

j. "Hyperlink," as used herein, refers to an item on a web page or in a mobile application which, when selected, transfers the user directly to another location in a hypertext document or to some other web page or (part of) a mobile application.

k. The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

l. "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

m. An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

n. "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

o. "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

p. "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

q. A "storage medium" is any physical object upon which computer data can be recorded. Examples include hard disks; RAM; "thumb," "jump," or "flash" drives; CD/DVDs; and other magnetic or optical media.

r. "URL" is an abbreviation for Uniform Resource Locator and is another name for a web address. URLs are made of letters, numbers, and other symbols in a standard form. People use them on computers by clicking a pre-prepared link or typing or

copying and pasting one into a web browser to make the computer fetch and show some specific resource (usually a web page) from another computer (web server) on the Internet.

s. "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

t. A "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

u. "Wireless telephone" (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.\

## BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE

### INITIAL REPORT AND FORENSIC INTERVIEW

5. On or about March 12, 2026, law enforcement received a report from the Kansas Department of Children and Families (DCF) regarding a 15-year-old minor victim (MV1) whose identity is known to your affiant. The report stated that the minor disclosed to a school counselor that they may be pregnant after engaging in sexual intercourse with an adult male whom they had met online.

6. A forensic interview was conducted with MV1. During that forensic interview, MV1 disclosed that they began speaking an adult male, later identified as **Cameron Blount**

(**BLOUNT**) through the social media application Snapchat after **BLOUNT** added MV1 through Snapchat's "Quick Add" feature. MV1 stated that they began to communicate with **BLOUNT** via Snapchat and through MV1's assigned public school (K-12) email address for several weeks prior to meeting in person. MV1 stated that the purpose of BLOUNT traveling to Kansas was to have sexual intercourse with MV1.

7. MV1 disclosed that **BLOUNT** left Georgia on or about February 13, 2026, and traveled to Kansas. **BLOUNT** picked MV1 up from their residence on or about the evening of February 14, 2026. After picking up MV1, **BLOUNT** went straight to a local hotel where he had reserved a room prior to his arrival.

8. MV1 stated that once inside **BLOUNT's** hotel room, they began watching a movie. During the movie, MV1 stated that **BLOUNT** began rubbing their arm and asked if MV1 wanted to get under a blanket. **BLOUNT** told MV1 they did not need clothes on, so they took off their clothes. MV1 stated that **BLOUNT** began penetrating them with his penis and ejaculated inside of MV1 on two occasions. Due to **BLOUNT** ejaculating during sexual intercourse, **BLOUNT** stated that he would purchase a Plan B for MV1 from a local Walmart.

9. After having sexual intercourse, **BLOUNT** transported MV1 back to their residence that evening. **BLOUNT** returned to his hotel and waited for Walmart to open.

10. On or about February 15, 2026, **BLOUNT** traveled to Walmart, purchased Plan B for MV1, and left it outside MV1's residence prior to leaving for his return trip to Georgia.

11. MV1 provided a description of **BLOUNT**, the clothes he wore, and the vehicle he transported MV1 in that evening. Investigators also accessed to MV1's cellular telephone and obtained BLOUNT's email address "cameronblount1346@gmail.com" and Snapchat username "caamblountt" that was used to communicate with MV1.

INVESTIGATORS COROBORATE MINOR VICTIM'S STATEMENTS

12. Law enforcement contacted the local hotel, who confirmed that on or about February 14, 2026, **BLOUNT** had rented a room utilizing an email address, telephone number, and credit card associated with **BLOUNT**. The reservation was made online utilizing an email and telephone number associated with **BLOUNT**.

13. Law enforcement contacted a local Walmart regarding the purchase of the Plan B contraceptive described by MV1. During a review of store surveillance video, investigators observed a male matching **BLOUNT's** description enter Walmart on or about February 15, 2026. While there, the male purchased a Plan B contracept utilizing a credit card associated with **BLOUNT**. Surveillance video also showed the male driving a dark colored vehicle consistent with the vehicle MV1 stated **BLOUNT** was driving the evening of February 14, 2026.

14. Investigators later obtained a search warrant for **BLOUNT's** associated Google account. During a review of the records, investigators located information showing **BLOUNT** rented a vehicle in Georgia on February 13, 2026. The make and model of vehicle matched the description of the vehicle seen on Walmart surveillance footage. The records also documented the vehicle's returned on February 15, 2026.

15. Investigators also obtained a search warrant for records from Hertz car rentals. These records corroborated the Google records, documenting **BLOUNT's** purchase of a rental car in Georgia utilizing a credit card and phone number associated with **BLOUNT**. The records also provided telematics data using the vehicle's factory installed GPS, which documented **BLOUNT's** trip from Georgia to Kansas between February 13 to February 14, 2026, and his return trip on February 15, 2026.

16. Investigators obtained a search warrant for **BLOUNT's** cellular telephone records. During a review of those records, investigators confirmed the telephone number utilized to rent the hotel room and rent the vehicle was assigned to **BLOUNT**. Additionally, a review of cellular tower data also documented **BLOUNT's** trip from Georgia to Kansas between February 13 to February 14, 2026, and his return trip back to Georgia on February 15, 2026. These records corroborate the telematics data received from Hertz.

BLOUNT RETURNS TO KANSAS

17. Investigators received information that **BLOUNT** had likely returned to Kansas. Investigators received records from Enterprise Rental Car showing **BLOUNT** rented a Dodge Ram pickup truck in St. Louis, Missouri and returned the vehicle in Oklahoma City, Oklahoma.

18. License plate readers captured the rented black Dodge Ram pickup truck entering Chanute, Kansas on or about April 16, 2026, at 7:39AM, and remained in the city for approximately two hours.

19. City of Chanute video cameras capture the following timeline:

a. 7:38AM – A female believed to be MV1 walks from the local high school across the street to the Love's Travel Stop, which is next to the hotel **BLOUNT** took MV1 to in February 2026.

b. 7:40AM – A black Dodge Ram stops at the Love's Travel Stop.

c. 7:42AM – The black Dodge Ram leaves the Love's Travel Stop. A black male is observed operating the vehicle.

d. 8:40AM – The black Dodge Ram drives to the local high school.

e. 9:42AM – The black Dodge Ram passes Love's Travel Stop, leaving Chanute.

20. School Resource Officers at the local high school confirmed that MV1 was marked unexcused absent during the first two hours of the school day.

21. On or about May 5, 2026, MV1 was forensically interviewed a second time. During the forensic interview MV1 stated that they met **BLOUNT** on the morning of April 15 or 16 at the Love's Gas Station across the street from the local school. MV1 stated that **BLOUNT** wanted to know what happened when they were interviewed by investigators. **BLOUNT** also gave MV1 a pregnancy test and asked MV1 to use it.

22. MV1 initially stated that they drove around the city, kissed, and then **BLOUNT** returned them to school. However, MV1 would later state that **BLOUNT** had sexual intercourse with them before dropping them off.

ARREST OF BLOUNT AND SEARCH OF CELL PHONE

23. On or about April 30, 2026, **BLOUNT** was taken into custody in Georgia on an outstanding arrest warrant issued by the State of Kansas. During the arrest, **BLOUNT's** cellular telephone was seized. A subsequent search warrant was obtained for **BLOUNT's** cellular telephone.

24. During a review of **BLOUNT's** cellular telephone extraction, investigators observed chats between **BLOUNT** and MV1 starting on or about January 26, 2026. The following will document a communication timeline observed by investigators:

a. On or about January 30, 2026, **BLOUNT** states that he will not be able to meet with MV1 because it is snowing. **BLOUNT** states that he will make it up to MV1 and drive up to meet with MV1 on his days off.

b. On or about February 6, 2026, MV1 informs **BLOUNT** that their guardian has disciplined them and taken their phone away. **BLOUNT** tells MV1 that if they get

their phone back, he will travel to Kansas and rent a hotel. MV1 provides **BLOUNT** with their assigned public school (K-12) email address so that they can continue to communicate. **BLOUNT** provides MV1 with his email address - "cameronblount1346@gmail.com".

c. The following text communications take place on or about February 10, 2026, at 7:41PM:

   i. BLOUNT (B): I want you so bad. I want you to be so nasty w me when you see me.
   ii. MV1: Like how?
   iii. B: hmm depends, how nasty are you?
   iv. MV1: Like what you want me to do
   v. B: I want you to put it in your mouth and suck it so good. Make sure you're talking back to me when I'm talking to you. do everything i say do. you better…
   vi. B: Are you gonna drink w me?
   vii. MV1: Idk yet. I can ride you.
   viii. B: you're such a good girl. I can't wait to be inside you.
   ix. MV1: That's good.
   x. B: make sure you delete these messages lmao
   xi. MV1: I will.
   xii. B: you on birth control?

d. This communication continues, with **BLOUNT** continuing to discuss the sexual acts he wants from MV1; including hair pulling, choking, and rough sexual intercourse. The following is observed on or about February 10, 2026, at 8:22PM:

   i. B: When is your bday
   ii. MV1: Dec 22…Why'd you ask about my b day
   iii. B: I didn't know when you turn 16

25. After **BLOUNT** indicated that he knew MV1 was 15 years old, **BLOUNT** continues to plan his travel to Kansas to have sexual intercourse with MV1. Investigators observed that **BLOUNT** conducted a Google search for "kansas age of consent" on his cellular telephone.

a. On or about February 10, 2026, **BLOUNT** tells MV1 that he is booking a hotel room in Kansas. **BLOUNT** asks MV1 how far their house is from the hotel. **BLOUNT** also sends MV1 a screen captured image of his scheduled vehicle rental in Atlanta, Georgia. The scheduled pick-up date is recorded as February 13, 2026. **BLOUNT** scheduled the drop off date for February 15, 2026.

b. On or about February 11, 2026, **BLOUNT** directs MV1 to take a picture of themselves in a specific pose and send them to him. MV1 complies with **BLOUNT's** request. In the photograph, MV1 is be observed displaying their clothed buttock.

c. On or about February 13, 2026, the communications between **BLOUNT** and MV1 begin to memorialize **BLOUNT's** trip from Georgia to Kansas. MV1 shares their residential address with **BLOUNT**. On or about February 14, 2026, at 9:30PM, MV1 texts that one of their guardians are asleep but they are waiting for the other to fall asleep before they can sneak out of the house. At 11:46PM, **BLOUNT** tells MV1 he has arrived at their residence. **BLOUNT** tells MV1 to delete their communications.

26. On or about February 15, 2026, communications between **BLOUNT** and MV1 document **BLOUNT** traveling to Walmart and purchasing Plan B for MV1 to take. **BLOUNT** documents him delivering the Plan B outside MV1's residence and then leaves for his return trip to Georgia. During his return trip to Georgia, **BLOUNT** and MV1 discuss the sex acts that

**BLOUNT** performed on MV1. MV1 tells **BLOUNT** they did not like the anal intercourse. **BLOUNT** tells MV1 he will be back to see them again at a later date.

27. On or about March 26, 2026, MV1 contacts **BLOUNT** via Facebook messenger. MV1 informs **BLOUNT** that law enforcement have been contacted. The following communication is observed:

a. MV1: So the cops took my phone and my computer

b. B: i figured. You didn't erase anything did you?

c. MV1: I couldn't. I had no time to.

d. *Disappearing messages is turned. All messages that takeplace after this time have been erased*

28. Additional data on BLOUNT's cellular telephone supports information that **BLOUNT** returned to Kansas on or about April 16, 2026.

29. On or about April 16 2026, at 8:18AM, when BLOUNT is believed to be meeting with MV1, the following search was conducted on **BLOUNT's** cellular telephone made during the time investigators believe he made contact with MV1:

a. "can you drink coffee while pregnant"

30. On or about April 16, 2026 at 11:53AM, BLOUNT's cell phone records that his location just across the Kansas/Oklahoma border.

ADDITIONAL POTENTIAL MINOR VICTIMS OBSERVED

31. Investigators also located other potential minor victims during the review of BLOUNT's cell phone communications. The following are a few of the possible communications involving minor victims observed on BLOUNT's cellular telephone extraction:

a. On or about January 24, 2026, **BLOUNT** communicates with AW. During the communication, both agree to meet and exchange $150 for “two hours”. HSI agents have tentatively identified AW and determined that they would have been 15 years old at the time of the communication.

b. On or about February 11, 2026, **BLOUNT** communicates with BV. During the communication, BV states that they are eligible to graduate from school in 2027. **BLOUNT** tells BV, “I wanna cum. send me pictures of you”. BV asks “what specifically do you want?” **BLOUNT** replies, “idk. be daddy’s good girl and surprise him.” BV sends a close-up of a buttocks wearing undergarments. **BLOUNT** asks for additional photos and BV sends a photo of bare breasts.

c. On or about March 12, 2026, **BLOUNT** and JK discuss meeting. JK identifies themselves as a 15-year-old. **BLOUNT** states that he will bring alcohol and THC cartridges. **BLOUNT** then discusses having sexual intercourse in a hotel room booked by **BLOUNT**. The continued communication appears to indicate that **BLOUNT** and the minor met on or about March 12, 2026. On or about March 28, 2026, JK sends **BLOUNT** a short video where they are seen crying while nude. JK’s breast are visible in the video.

32. HSI is actively attempting to positively identify the above listed persons to confirm their age and level of victimization.

33. On March 16, 2026, a search warrant was issued for records from **BLOUNT’s** Snapchat account. During a review of those records, I located one report of **BLOUNT’s** account violating Snapchat’s Terms of Service. The reporting party does not appear to be linked to MV1.

34. On or about January 28, 2026, the reporting party alleges **BLOUNT** knows they are 14 years old child and is asking to meet them at a hotel. The Snapchat user states that **BLOUNT** is also offering to purchase them alcohol.

35. The Snapchat records also provided a selected section of the chats between **BLOUNT** and the self-identified minor. In that conversation, **BLOUNT** is observed telling the reporting party that they are booking a hotel room and will send the hotel information to the minor. **BLOUNT** asks the minor what kind of alcohol they want him to purchase for them. **BLOUNT** then asks the minor what time they would sneak out of their parent's house to meet him at the hotel.

36. On or about September 10, 2026, **BLOUNT** was indicted by a federal grand jury for violations of 18 U.S. Code § 2423(b). On or about September 15, 2026, **BLOUNT** was arrested by HSI SAs at the Crawford County Judicial Center in Pittsburgh, Kansas.

37. Prior to the arrest, agents observed **BLOUNT** operating the **TARGET DEVICE** as he entered the Crawford County Judicial Center. When agents approached **BLOUNT** and identified themselves, **BLOUNT** placed the **TARGET DEVICE** in his front pocket. Agents asked **BLOUNT** if he had any items in his pockets at the beginning of their pat down search. **BLOUNT** removed the **TARGET DEVICE**, a wallet, and a house key from his pockets and provided them to agents.

38. The **TARGET DEVICE** was placed into airplane mode in order to preserve any digital evidence that was on the device at the time it was collected. Agents transported the **TARGET DEVICE** back to the HSI office in Wichita, Kansas and placed it into a secure location pending the application for a federal search warrant.

39. When the phone was collected, agents observed the **TARGET DEVICE** receiving numerous Snapchat notifications on the **TARGET DEVICE's** lock screen. These notifications also indicated that other Snapchat accounts were messaging **BLOUNT**. Agents observed that a different female bitmoji[1] was associated to each received notification.

40. Due to the large number of self-identified minors **BLOUNT** was communicating with on his prior cellular device, I believe it is probable that evidence of additional minor victims will be present on the **TARGET DEVICE**.

41. In my training and experience, I know that the **TARGET DEVICE** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **TARGET DEVICE** first came into the possession of HSI.

42. Due to the facts presented above, I believe that the **TARGET DEVICE**, further described in Attachment A, contains additional contraband and evidence, fruits, and instrumentalities, further described in Attachment B, of violations of 18 U.S. Code § 2423(a) (transportation with intent to engage in criminal sexual activity); 18 U.S. Code § 2423(b) (travel with intent to engage in illicit sexual conduct); 18 U.S.C. 2251(a) (production of child pornography); 18 U.S.C. § 2252A(a)(2) (distribution/receipt of child pornography); 18 U.S.C. § 2252A(a)(3)(B) (distributes or solicits child pornography); 18 U.S.C. § 2252A(a)(1) (transportation of child pornography); and 2252A(a)(5)(B) (possession of child pornography). I respectfully request that a search and seizure warrant be issued for the **TARGET DEVICE**.

---

[1] Bitmoji is a cartoon-style personalized digital avatar used on the Snapchat application. Users will typically create an avatar in their likeness and use it as a visual representation of them on the Snapchat platform.

**CHARACTERISTICS OF INDIVIDUALS WHO HAVE A SEXUAL INTEREST AND EXPLOIT CHILDREN**

43. As set forth above, I believe probable cause exists that **BLOUNT** used the **TARGET DEVICES** to commit and/or facilitate his criminal behavior; including to coerce or entice a child, produce, receive or possess child pornography, and travel to or with a minor to facilitate sexually explicit conduct with a minor.

44. Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals involved in such crimes:

d. Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity

e. Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

f. Such individuals almost always possess and maintain child pornographic material in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain those materials and child erotica for many years.

g. Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

h. Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[2]

i. Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain contact information (e.g. online messaging accounts, email addresses, etc.) of individuals with whom they have been in contact and who share the same interests in child pornography.

j. Such individuals prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

k. Such individuals who receive, possess, and distribute images of child pornography sometimes utilize email accounts and online "cloud" storage to correspond with other persons sharing similar interests; and that those persons sometimes utilize those email accounts and online "cloud" storage to receive, transmit and store images of child pornography. Cloud-based storage can be utilized by child pornography distributors/possessors to add a layer of anonymity to their actions, as well as attempt to conceal the trading and collecting of child exploitation material from law enforcement.

l. Such individuals use popular messaging applications, online chat rooms, gaming platforms, and private servers as a way to gain access to and interact with minors, which provide an avenue to commit and/or facilitate their criminal behavior.

m. Such individuals can devote a substantial amount of time communicating, grooming, and coercing a minor to commit and/or facilitate their criminal behavior. They often memorialize this contact with their victims by producing images and videos of these encounters. As such, these individuals rarely destroy their produced material and their correspondences with their victims. Some may remain in communication with their victims for extended periods of time.

---

[2] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370-71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010)).

**BACKGROUND ON COMPUTERS, THE INTERNET, AND CHILD PORNOGRAPHY**

45. Based on my experience in the investigation of computer-related crimes and the discussions I have had with other investigators who have experience in investigations related to child exploitation, I know the following:

a. Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

b. Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth." Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone, or transferred to external storage devices, such as a USBC. These memory cards and USBC devices are often large enough to store thousands of high-resolution photographs or videos.

c. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. Electronic storage media of various types - to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer - can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

d. A modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections. Electronic contact can be made to literally millions of computers around the world. Child pornography can therefore be easily, inexpensively and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

e. The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f. Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service

that may provide email services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

g. A growing phenomenon related to smartphones and other mobile computing devices is the use of mobile applications, also referred to as "apps." Apps consist of software downloaded onto mobile devices that enable users to perform a variety of tasks – such as engaging in online chat, sharing digital files, reading a book, or playing a game – on a mobile device. Individuals commonly use such apps to receive, store, distribute, and advertise child pornography, to interact directly with other like-minded offenders or with potential minor victims, and to access cloud-storage services where child pornography may be stored.

h. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (*i.e.*, by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional. Digital information, such as the traces of the path of an electronic communication, may also be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

46. I submit that there is probable cause to believe those records referenced above will be stored on that electronic device or storage medium, for at least the following reasons:

a. Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

b. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer

has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

47. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described in the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the item listed in Attachment A because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage

media was accessed or used. For example, computers typically contain information that logs: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the Internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., Internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for

evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

48. Based upon my training and experience, and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. I know that during searches, it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a. Searching computer systems is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software, or operating system that is being searched;

b. Searching computer systems requires the use of precise, scientific procedures, which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

49. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

50. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

51. I submit that this affidavit supports probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits, and instrumentalities of these offenses, more fully described in **Attachment B**, are located in or at the location described in **Attachment A**. I respectfully request that this Court issue a search

warrant for the location described in **Attachment A**, authorizing the seizure and search of the items described in **Attachment B**.

Respectfully submitted,

Travis Putrah, Special Agent
Homeland Security Investigation

Sworn to and subscribed before me via Zoom on this 21st day of September, 2026.

HONORABLE BROOKS G. SEVERSON
United States Magistrate Judge

# ATTACHMENT A

## DEVICE TO BE SEARCHED

An **iPhone 17 cellular telephone** obtained from **Cameron Blount** at the time of his arrest and currently located within the Homeland Security Investigations office in Wichita, Kansas.

## ATTACHMENT B

## PARTICULAR ITEMS TO BE SEIZED

All records on the **TARGET DEVICE** described in Attachment A that relate to violations of 18 U.S.C. §§ 2422(b); 2423(a), (b) and (f); 2251(a) and (e); 2252A(a)(2) and (b)(1); 2252A(a)(5) and (b)(2); and 875(c), or attempts to do so, concerning the sexual exploitation of minors. This authorization includes the search of electronic data to include deleted data, remnant data and slack space. The seizure and search of computers and computer media will be conducted in accordance with the procedures set forth in the affidavit submitted in support of this warrant. Items to be seized include the following:

1. Any and all computer software, including programs to run operating systems, applications, utilities, compilers, interpreters, and communications programs, including, but not limited to, P2P or other software or applications that may be, or are used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.

2. Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, e-mail messages, chat logs, google searches and electronic messages) pertaining to the offenses listed above.

3. In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

4. Any and all diaries, address books, names, and lists of names and addresses of individuals who may have been contacted by the operator of the **TARGET DEVICE** for the purpose of engaging in the offenses listed above.

5. Any and all records or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages), identifying persons transmitting, through interstate or foreign commerce by any means, including, but not limited to, by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

6. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, other digital data files and web cache information) concerning the offenses listed above.

7. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about exploiting children or child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in exploiting children or child pornography.

8. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that exploit children or provide or make accessible child pornography to members.

9. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider.

10. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

11. Any and all visual depictions of minors.

12. Evidence of any interaction with, photos of, or evidence of the above referenced crimes involving MV1 and any other minors.

13. Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

14. Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

15. Evidence of user attribution showing who used or owned the device at the time the crimes listed in this warrant were committed, including:

a. records of Internet Protocol addresses used;

b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

16. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

17. All bank records, checks, credit card bills, account information, and other financial records concerning the offenses listed above.

18. Any information recording **BLOUNT's** schedule or travel or movement concerning the offenses listed above to the present.